We will proceed with our third case for this morning, United States v. Jackson, case number 241776 and 242260. I believe we have Mr. Rosen. It's going to be remote. There we go. Hello? Yes, Mr. Rosen, we can hear you. We can see you, although you are in portrait kind of mode rather than landscape. I don't know if we can flip that. There you go. That's much better. Thank you. Okay. So I just wait now, and then they'll call me in, right? Yes, in fact, you are being called right now.  So, Mr. Rosen, if you are ready, whenever you're ready, you can proceed. I'm ready. Do I just start talking? Yes, you can just start talking. Okay, good morning, Your Honors. Mark Rosen appears on behalf of the defendant, Cornelius Jackson. As the Court has noted, I have two issues before the Court. The first issue is pretty clear. It is our position, and I think it's pretty, the case law is on point, that there was, Frank's motion should have been granted in this case. I think there was reckless disregard for the truth by the deputy that put this thing together, this affidavit together. There was clear indication where he just picked and chose what he wanted to put on in the affidavit. He put on anything that might remotely seem inculpatory, excluded any sort of exculpatory omissions, and that's outlined in my brief, pages six to seven. I think the case law is pretty clear. I was referring to Glover, U.S. v. Glover, where this Court basically talked about emitting information. In this case, Glover indicates at head note eight that the issuing magistrate should not have been forced to rely on other factors because vital credibility information was emitted from the affidavit. The credibility information here, and I know Glover was talking about a warrant, wasn't talking about an informant, but I think the case law is pretty clear and is pretty analogous to the present situation, that they picked and chose. They emitted stuff that was exculpatory. They relied on one of these alleged victims, AV4. They picked and chose what they thought would be helpful for them, and they omitted any of her omissions, indications that nothing happened, the omissions, any talk about that nothing had happened that had been voluntary, we were just walking downtown. She said, no, we were not doing prostitution. All those sorts of statements were omitted, and I think those were pretty clear to her credibility because her credibility was the sole basis for this affidavit, and this affidavit the law enforcement used to search and access my client's cell phone and records, which led to a lot of inculpatory evidence that came out at trial, basically with respect to other websites, Tinder. I think there were some other websites that were used to basically try to solicit people, and it came out, Melissa Fuss testified at the trial about that, and I think that basically because of the reckless disregard for the truth. Now the government, not the government, I'm striking at, the magistrate basically said, oh, you know, it's basically because she'd been choked, so it's pretty clear that she would have given some, just given some exculpatory information. Mr. Counsel, if you can back up, what do you make of the fact that the affidavit also left out some inculpatory information? Well, I think the issue was whether or not they left out inculpatory information. I think it may have made their case stronger, but I still think it goes to the fact that that would not be relevant to whether or not there's a Franks motion and whether or not this deputy had recklessly disregard for the truth and preparing his affidavit by omitting the exculpatory information. The warrant had gotten granted, and I don't know what would have happened. All I know is that there was a large number of exculpatory information that was omitted from this affidavit that basically, I think, warrants a Franks motion. I mean, I think Glover is right on point. You can't just sort of find, well, you know, this sort of surmising that, well, you know, she'd been choked before, and that's therefore why she made some different statements. The deputy that put this together had the reports, and he knew what he was putting in. He basically tailored this thing to make it sound like it was as inculpatory as possible so he could get his warrant and get that information. But I think here a Franks motion was necessary. Also, I think as far as the issue of the electronic devices, I do think there was an insufficient nexus. I think one of the things about that is, again, basically relying upon AV-4's affidavit in terms of that. A lot of the information in the affidavit for phones and things like that is based upon her phones. They looked at her phones. Paragraph 15, they're talking about her phone, not his. So I think these are about text messages. They could have got that through phone records as well as through her phone. They didn't need to. There's nothing there. Plus, I don't think that Stucker was qualified in terms of even making this affidavit because he basically stated, look, my experience has been I've done a lot of law enforcement. He never said anything about human trafficking. The only thing he said about sexual assaults was I've done numerous investigations in a wide array of crimes, nothing about human trafficking, including sexual assault of children. Well, that's not human trafficking. That's not basically prostitution or pimps or anything of that nature. So I don't even think Stucker had the experience and the expertise to make this affidavit in the first place. And I think that was brought out. As far as Ms. Anderson is concerned, I don't think there was sufficient qualification for her to testify about anything related to this case. She had been a state prosecutor in Florida. And I think this came out by the trial court. There was basically she had been a state court for a while, no federal. She testified I think only twice in the Eastern District of Wisconsin. She was a prosecutor. She was not a field agent. The case law cited by the government was talked about field agents based upon hearsay. She had no psychology courses she'd ever done. These are the ‑‑ plus her testimony added nothing to the witnesses. It's the witnesses' credibility that you have to look at here. And the witnesses' credibility stands out as its own. I think it improperly intruded upon the province of the jury. She's getting up there saying, well, you know, these people, you know, alleged victims often lie and they often give piecemeal truths. And they're also talking about those sorts of things. And I think that's basically something that is based upon, should have been based upon solely upon the testimony of the witnesses and through cross-examination. She improperly bolstered, and with the lack of experience that she had in federal court. I think the court basically pointed out the fact that we don't know what the elements are of this sort of human trafficking cases down in Florida. What we don't know is ‑‑ we don't know how those relate to state ‑‑ federal statutes in terms of human trafficking. So how is any of that relevant? Her testimony basically was based upon insufficient data. There's no methodology. The government never provided any methodology or data criteria in terms of how ‑‑ principle methods in terms of how it's very, very subjective on her part and how to put this together and how she did this. So I think that there basically was an issue there with her testimony. And it was not harmless error. I think the government indicated in its brief it was, oh, there was harmless error because of the testimony of the victims. But she improperly bolstered the testimony of those victims. I mean, the government basically says harmless error, but then why did they go to the trouble of calling? This happens a lot. Why do they go to the trouble of fighting to have this woman, this person testified, this so‑called expert testified? Because they need to bolster these victims. They need to make these victims look better than their testimony is because there's a lot of dirt on these victims. And these victims ‑‑ it's basically telling the jury, believe these victims, notwithstanding what you hear. So I think that that's basically ‑‑ so they're saying harmless error, harmless error. Well, clearly, even their position on this is it's not harmless error because of the fact that they called her. They wanted to call her. They fought to have her testify. They, you know, worked out resolutions, so to speak, to have her testify. So I think that that's basically what happened with Ms. Anderson. So I think for those reasons, I think the ‑‑ I think I would ask the court to vacate the judgment of conviction. If there are no further questions, remand this matter for a Franks motion based upon the warrant issue. And I think basically give a new trial to my client based upon both the warrant. Well, we see what happens with that Franks motion as well as Anderson. I think it was not harmless error, so I think he deserves a new trial on that basis. So if there are no further questions, Your Honor, I'll save my time for rebuttal. Judge Whipple, any questions? No, thank you. Okay. Thank you. We'll now hear from the government. Mr. Proctor. May it please the court. Benjamin Proctor, a parent for the United States. I will address all the issues raised by Mr. Jackson's counsel here. As he notes, two of the issues are reassertions of pretrial suppression motions concerning the warrant for Mr. Jackson's house. The first issue that he raised in his brief that I'll talk about is the nexus. Now, he's contending that there's nothing in this warrant that connects phones to sex trafficking. But I think that ignores the record, and that's what the district court found. He's misstating the record. The warrant includes facts that establish that Mr. Jackson was involved in sex trafficking. Mr. Jackson had electronic devices. The residence was involved in sex trafficking, and electronic devices were connected to the sex trafficking. Indeed, the affidavit includes AV4's statement that Jackson's rules, which he said to her, required the victims to text Mr. Jackson during sex dates at the residence. Mr. Jackson's phone was one of several devices that were recovered pursuant to the search warrant. So to say that there's nothing in the record that an issuing judge could have a basis to have a fair probability that evidence of sex trafficking would be found in that phone, his argument can be rejected on that front. I'll move on to the Franks issue. The statements from AV4 made to Police Officer Orozco later in the day on August 23rd covered everything from how she first met Jackson, the car details about the car he drove, where they went to a casino after he picked her up, then later about how she came to live at Jackson's residence with these other women, and then how she became involved in Jackson's sex trafficking operations. Those are the detailed statements she made to Officer Orozco that was later relayed to Detective Stucker in Waukesha County. The alleged omissions here are a few instances. He pointed to, I think, five instances in his initial motion in which pulled from video earlier that same morning that AV4 initially denied that she was engaged in prostitution. Now, as the District Court pointed out, we need to look at the context for these omissions. She had just been strangled by Cornelius Jackson and left on the street in Milwaukee, a place that she was not familiar with. She had been thrown to the ground and had her phone taken away from her by Mr. Jackson that morning while other women looked at her. She was traumatized. She was scared. She called 911 because she needed, she wanted some help. She wanted to get her belongings and she wanted to get out of town. Now, she was reluctant to tell Officer Pittman just about anything. She even denied initially that anybody had hurt her that evening when Officer Pittman came up in response to a 911 call asking her what's going on. She's standing next to AV2, who she later referred to as the bottom, as the boss mama of the operation. It took good police work to separate her when her in a police van. And it took her courage to eventually start providing more coherent answers to the questions that Officer Pittman was asking. All of this two-hour interaction between AV4 and Officer Pittman was captured on video. The magistrate judge, the District Court judge made findings based on that video that this was an evolution of a traumatized victim into providing coherent answers. Now, in looking at it that way, the District Court found it's hardly surprising that she initially denied involvement in prostitution at that time. It's not surprising for a traumatized victim to do that. And therefore, there was nothing untrustworthy about her later detailed statements that made it into the affidavit. For that reason, the statements are immaterial under the Franks analysis. Now, Mr. Jackson has also not proffered any evidence at any stage as to why the affiant, Detective Stucker, must have had some intentional or reckless intent, reckless disregard for the truth in omitting these statements. He simply says that it's so obvious based on the nature of these omissions that we can just assume that there's recklessness. That's not the Franks standard. He points to Glover, but Glover is easily distinguishable. Glover is based on some very unique and extreme facts where a police officer left out, got a tip, and it wasn't a very good tip, from a confidential informant that led to a search warrant, but the affidavits put forward by the affiant did not include anything about that informant's credibility. And concerns about that credibility, which include numerous prior convictions, use of aliases, gang membership, and an interest in getting paid for his work. That's not what we have here. We have a traumatized victim engaging and revealing information to police that is immediate. She knew about this. It's firsthand information. It is personal information about her own involvement. So he failed at both stages of the Franks analysis, and the court should affirm the district court on those grounds. I'll then turn to the expert witness issue. Now, the scope of the expert witness testimony was whittled down to just four topics. That was based on the district court's direction at the final pretrial conference. The district court went through all the party's arguments laid out in the expert notice, the Daubert motion, the response to the Daubert motion, recited rule 702. It went through several decisions from this court about its gatekeeper role, and it decided, yes, there are some topics that I believe that this witness can provide helpful and educational testimony to the jury on. It went forward like that. They limited the testimony to four topics that were all related to testimony provided by other witnesses. The expert witness did not opine about any facts specific to this case or any of the victims. She didn't even know the testimony of any of these victims, how many victims there would be that were testifying or anything like that. She educated the jury about a subculture, the sex trafficking subculture that is generally considered to be outside of the understanding of most jurors. Her testimony was limited and tailored to this case. If for some reason the court was to find that the district court abused its broad discretion in allowing this testimony to come in, the error was harmless. Again, because these victims testified extensively about their personal experiences, the expert testimony provided a lens through which the jury can help interpret that testimony and the cross-examination evidence that they provided. But ultimately, the jurors had to decide if the victims were telling the truth or Mr. Jackson, who also testified at length, was telling the truth. The government also presented evidence of videos, the poll cam videos showing AV4 being choked, videos from the casino showing AV3 sprinting away, trying to escape, getting into her sister's car and Mr. Jackson chasing her. It also included videos and text messages from AV2's phone, from Jackson's phone. There's a lot of evidence in this case. So it would be very difficult to look at the 50 minutes split between direct and examination of this expert testimony over a seven-day trial as being the thing that moved the needle towards the guilty verdict. And the overwhelming evidence showing that there was a guilty verdict. I see I'm not getting any questions. If the court does have any questions, I'm happy to answer those. Otherwise, I'll rest on my grief and yield back the balance of my time. Thank you. Thank you, Your Honor. Well, I think there's a number of issues with the government's arguments. The warrant was based upon AV4's statements, inculpatory statements to the police. And the government has tried to – the government has admitted in its arguments that there were – that she had made – that there were omissions in Stucker's affidavit and reckless – there was omissions that – and that AV4 during her interviews, earlier interviews on video, had indicated evidence that was exculpatory, that nothing had happened, things like that. But then the government is saying, well, she was a traumatized victim. Well, we don't know how much – we're just sort of speculating on that. We don't know how much trauma she had suffered. We don't know what had happened. We don't know why this had happened. All we know is that Stucker had picked and chose what he wanted to do to get the warrant. He omitted the inculpatory matters, and he included – he omitted the exculpatory matters. I take my – take it back. And he omitted any of the exculpatory matters, and that he picked and chose. Why he did that or something like that is pretty much up there. That's – we can simply surmise. And the state – the government sits there and talks about, well, Glover is inapplicable because it had to deal with informants and he had a bad past and sort of things. But Glover had general language about how to deal with these sort of issues here. And what they said is – and I'm looking at 814 of Glover, 755F3rd814. The affidavits – and it states, this court, Seventh Circuit, the affidavits omission of all information about the informant's credibility – in this case, informal would be AV4 – is sufficient to raise an inference of reckless disregard for the truth. That's what we have here. And it is a relatively low bar, as indicated in my brief, to have a – to get a Franks motion. It's not the same standard as proponents to actually win at it, but it's enough to get it. And I think we've got that here because of the fact that as House Stucker handled this and basically picking and choosing what he wanted to pick. And as indicated, this is what – this is – Glover states that, that this is – this bar is here. And also, as far as, well, this whole traumatized – she was a traumatized victim. Again, we don't know how she – how much trauma she had suffered. We don't know what was going on. We don't know as to whether or not any of this choking or any of this had really affected her statements. But they omitted it. Stucker omitted this, and he could have – as indicated in – at 818 of Glover, the issue of majesty should not have been forced to rely on other factors such as this allegations of choking and trauma, which, again, was speculative. We don't know because vital credibility information was omitted from the affidavit. Mr. Rosen, in the – if I could ask you something. When she – AV-4, when she made those statements to the officer on the street, it was right after she was choked, but she also had – it was in the presence of another woman who was an alleged victim of trafficking, right? I believe so, yeah. And I – yes, I believe – and I thought that victim had testified at trial, that alleged – that woman had testified at trial. Yes, she was, but she was with a police officer, and she could have said, you know – there was basically an understanding that when you're with your police officer, the reason the police are there is to make you feel comfortable and safe. So I think that that is there, but that's a factor that could have been brought out and could have been mentioned as part of a Franks hearing. These are all sort of factual conclusions that really needed to be explored because we don't know what was going on in her head. All we know is that Stucker – I mean, he could have simply said – he could have put all this information in there and tried to clarify and said, well, you know, this was choking, it was on the street, and all that sort of stuff just to fill out the picture. But as indicated in Glover, this vital credibility information was missing, and because it's missing, as indicated in Glover, as I read, you've got this inference that the reckless disregard for the truth, and that's basically right out of Glover. And I know, as this government has said, there's some informant and that sort of thing with the Bass, but Glover – this law that Glover states is basically general law. I think that's pretty much applicable to any sort of situations like this. As far as Anderson is concerned, she may have been talking about the subculture of OTT, but also, as the government has indicated in its brief, some of the topics she talked about in this 50 minutes that she talked about, which the government had fought to get her in, was the reluctance – and it's page 21 of their brief – quote, the reluctance of sex trafficking victims to disclose their experiences and things like that, reasons why victims may not leave their traffickers at the first opportunity. This is all basically designed to bolster the testimony of these alleged victims, is basically to say, look, you've got all this cross-examination. I'm telling you, as an expert who has never met these victims – again, the government has never met these victims, don't know these victims, but they sort of say this is general information, but it applies to these victims. Otherwise, what's the point of having this person testify? It's there to bolster the testimony of these victims. Somebody, as the government has conceded, Ms. Anderson had never met, she doesn't know these people, and it's improper bolstering of these witness testimony. The testimony of these alleged victims was the crux of this case, and Anderson's testimony improperly bolstered that illegally. So I'd ask for the relief I argued earlier, Your Honors. Thank you. Judge Whipple, anything else? No, thank you. All right, we'll take the case under advisement.